## Koleff's Estate.

424

Argued October 3, 1940.   Before SCHAFFER, C. J.,
MAXEY, DREW, LINN and PATTERSON, JJ.

*Henry A. Jones,* with him *Fred T. Jarrett,* for appellants.

*Donald C. Knapp,* with him *L. N. Dilley* and *Martin
E. Cusick,* of *Service, McNeal, Cusick & Isenberg,* for
appellees.

OPINION BY MR. JUSTICE MAXEY, October 28, 1940:

The chief question before us is whether or not there
was sufficient evidence of the delivery of a note which
formed the basis of a claim against a decedent's estate.

The decedent, Nikola Koleff, came to the United
States from Bulgaria in 1909.   He later made a brief
visit to Bulgaria and returned to the United States in
1914.   He remained here until his death on November 1,
1937, at the age of 65.   His survivors were his widow, a
son and a daughter, all residents of Bulgaria.   They
appointed the Bulgarian Minister to the United States
as their attorney-in-fact.   There was no evidence of any
communication between the decedent and members of
his family for a period of more than five years preceding
his death.   The letters which infrequently passed be-

tween the decedent and his wife in Bulgaria indicated that their relations were not friendly. The letters from the wife to her husband generally included a demand for money. In one of her letters to him she said: "I am seeing it clearly that you refuse to help me."

Ancillary letters of administration upon the estate were issued to Henry A. Jones, Attorney at Law, Pittsburgh, Pa. At the time of his death decedent had about $13,000 on deposits in three different banks in Greenville. He also had a safe deposit box in the First National Bank of Greenville. In the spring of 1937 he became afflicted with a heart-kidney complication. This caused a swelling in his feet and legs. The prescribed treatment included scarifying and opening the legs to reduce the pressure. The claimants below, Pete Montson and Mary Montson, husband and wife, cared for decedent in his own home until September 1, 1937, and thereafter in their home until his death. The work of caring for this decedent well warranted compensation. The decedent's residence at No. 4 Pine Street was described by his physician as a "terrible abode," "foul smelling place," "more like a pig's pen." Decedent's condition was so offensive that claimants wore gloves and a mask when dressing his legs.

The note which is the basis of the Montsons' claim against the decedent's estate was dated July 31, 1937, and states: "On demand after date I promise to pay to the order of Pete Montson or Mary Montson Eight thousand dollars." The decedent's attending physician testified that about this date decedent, accompanied by Pete Montson, called at his office and that Montson exhibited a note and requested the doctor to witness its execution by Koleff. The doctor declined to do so for the reason that the amount payable was not set out. The court below in its opinion says: "It does not appear that the note exhibited to the physician is the identical note in controversy."

Decedent was unable to read or write. The note produced by the Montsons in this case was executed by a mark with George Beloff and Mary Beloff the subscribing witnesses. The auditor held that the note constituted a valid gift causa mortis. Counsel for next of kin filed exceptions to the payment of the note and these exceptions are grouped under four separate questions. The first is: "Whether there was any sufficient evidence, under the law of gifts, to show a delivery of the note where claimants have affirmatively shown that there was no delivery at the time." The "no delivery" referred to by the claimants is based upon the testimony of the subscribing witnesses, George Beloff and Mary Beloff.

The former testified that accompanied by his wife and child he visited the decedent in July, 1937. When Mary Montson completed the dressing of decedent's limbs, decedent said he wanted Beloff to do him a favor. The witness testified further: "He [Koleff] said he wanted to leave Mrs. Montson $8,000 and would we be a signature on his note, and we told him alright, we would sign the note. . . . He said to Mrs. Montson to put $8,000 on the note." The witness said that Koleff said that in English, not Bulgarian. This witness testified further: "Nick says he desires to leave and to write on a note $8,000.00 to Mr. and Mrs. Montson because she took good care of his leg and he gave the note to Mrs. Montson, she shall write into the same $8,000. And after she entered the $8,000 on the note she give the note to Nikola (the decedent). Nikola entered the cross and finger print on the note and then give it to me, asking that I and my wife shall witness the same. And we signed the note and gave the same back to him." Mary Beloff gave similar testimony.

The court below held that the testimony of the subscribing witnesses that the note was returned to decedent after they had subscribed their names did not overcome the presumption of delivery to the payees. The court said: "At most the subscribing witnesses merely

testified that they did not see the maker deliver the note to the payees. The presumption raised by the law was sufficient to establish a prima facie case, in the absence of evidence of some circumstances from which an intent not to deliver could reasonably be inferred. The subscribing witnesses offer no such evidence."

We agree with the court below that appellants place too much significance on the fact that after the decedent made his mark upon the note and the note was signed by the attesting witnesses, it was handed back to decedent and the attesting witnesses did not know what became of it. This handing back of the note to its maker was a natural thing to do under the circumstances and is not sufficient to rebut the presumption of delivery which arises from the other facts already referred to. All the facts preceding the making of this note and the circumstances attending its making indicate that the decedent intended to give those friends who ministered to him during his last illness $8,000. It is a legitimate inference from the circumstances (as well as a presumption from the form of the note) that the note was in fact delivered to the payees named therein. Attorney Dilley testified that the note was brought to his office by one of the payees about two weeks after its execution and that the note remained in his custody, he holding it on behalf of the payees. This actual possession of the note by the payees, together with other facts in the case, support the finding of the auditor, which was approved by the court below, that there was ample evidence to warrant a finding that the note was delivered. With this we agree.

We take it as unchallenged that proof of execution of the note by the decedent's mark is as effective as though his actual signing of the note by his own handwriting, if he had been able to write, would have been.

The second question presented to the court below by the next of kin was as follows: "Was there in the record any sufficient evidence of the adoption of the printed

'seal' attached to the note, to show the making of a donor note valid as a gift causa mortis." The court below cited *Lorah v. Nissley*, 156 Pa. 329, 27 A. 242, which holds that whether the word "seal" on a note is written by the signer of the note or is printed beforehand on the note is immaterial. In that case we said: "Ratification is equivalent to antecedent authority, and the writing of his [the maker's] name to the left of the printed word, so as to bring the latter into the usual and proper place for a seal, is ample evidence that he adopted the act of the printer in putting it there for a seal."

The third question presented to the court below was as follows: "Whether the making of the note was shown to be sufficiently free and clear of suspicious circumstances to permit it, if delivered, to have become a valid donatio mortis causa?" On this point the court below said: "The testimony of the subscribing witnesses does not, in our opinion, raise impressive inferences contrary to an intent to make and deliver the instrument, nor was the failure to read the note to the decedent sufficient to imply fraud. We are aware that the note was in a substantial amount, but a reading of the testimony discloses that the character of the services rendered by claimants was exceptional and was so regarded by decedent. Decedent had some $13,000.00 in savings accounts. The clear preponderance of such evidence as was offered on the question, indicates that he was estranged from his family. He frequently declared his intention to pay Montsons 'double' for their services, and to leave all of his estate to them."

The fourth question submitted was: "Does the evidence sufficiently show that claimants were acting in a confidential relation to decedent about July 31, 1937, and had failed to afford him independent advice concerning the note?"

In *Leedom et al. v. Palmer et ux.*, 274 Pa. 22, 117 A. 410, this court said: "Confidential relation is not confined to any specific association of the parties; it is one

wherein a party is bound to act for the benefit of another, and can take no advantage to himself. It appears when the circumstances make it certain the parties do not deal on equal terms, but, on the one side there is an overmastering influence, or, on the other, weakness, dependence of trust, justifiably reposed; in both an unfair advantage is possible." See also *Pyewell's Est.,* 334 Pa. 154, 5 A. 2d 123.

On this point the court below aptly said: "The only evidence offered to establish a confidential relation between the instant decedent and claimants was the testimony regarding the preparation of the note in controversy and the testimony that Mary Montson was authorized to have access to decedent's safe deposit box. . . . We are constrained to hold that there was not sufficient evidence to warrant us in declaring that a confidential relation existed between claimants and decedent."

The fifth question discussed by the court is as follows: "Whether distribution should be made here to foreign beneficiaries or to them by the forum of decedent's domicile?" The court below correctly held: "There was ample evidence that decedent's domicile was within the Commonwealth of Pennsylvania where he resided continuously since 1914. . . . One cannot maintain a domicile in one place when he has moved to another and intends to reside there the rest of his life, by any wish, declaration or intent inconsistent with the dominant facts of where he actually lives and what he actually means to do: *Com. ex rel. Fortney v. Bobrofskie,* 329 Pa. 44, 196 A. 489.

Both the auditor and the court below held that the note in question was a valid claim upon the estate. There was ample consideration for the note in the services rendered the maker by the payees. But it is not necessary in order to sustain the court below to find that there was legal consideration for the note. The court below correctly held that this note was a gift inter vivos. The court said: "There was no evidence that decedent

intended that payment of the note should be conditioned upon his death."

The validity of this note depends largely upon the testimony of the witnesses to its execution. The auditor who saw and heard the witnesses was in the best position to judge their credibility. The court below confirmed the report of the auditor. In this there was no error.

The decree is affirmed at appellants' cost.